**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CARLENE MORAN, | § | |
|    Plaintiff, | § | |
| v. | § | No. 3:11-CV-949-N (BF) |
| | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
|    Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Carlene Moran ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Act. The Court considered Plaintiff's Brief, Defendant's Response and Cross-Motion for Summary Judgment, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. The final decision of the Commissioner should be reversed and remanded for further consideration.

**Background**[1]

**Procedural History**

Plaintiff protectively filed an application for SSI on March 21, 2008. (Tr. 13, 136-141.) She alleged a disability onset date of November 1, 2007, due to bipolar disorder and seizures. (Tr. 136, 146.) The Commissioner denied Plaintiff's application initially (Tr. 57, 69-72), and again on reconsideration. (Tr. 58, 78-80.) Plaintiff requested an administrative hearing before an Administrative Law Judge ("ALJ") (Tr. 82), which was held on November 17, 2009. (Tr. 28-55.) On April 6, 2010, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 10-27.) On

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

August 20, 2010, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision to stand as the Commissioner's final decision. (Tr. 1-5.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

### Plaintiff's Age, Education, and Work Experience

At the time of her application, Plaintiff was 26 years old, a younger individual under 20 C.F.R. § 416.963. (Tr. 21, 136.) She was five feet six inches tall, weighed 207 pounds, and had a seventh grade education. (Tr. 32, 150, 266.) She had no past relevant work. (Tr. 21 ¶ 5.)

### Relevant Medical Evidence

In March of 2008, Plaintiff reported to ABC Behavioral Health, L.L.C., with depression, unprovoked anger, and crying spells. (Tr. 321.) She was assessed as having bipolar disorder and severe depression with psychotic features. (Tr. 237.) During this visit, Plaintiff reported that she felt tired all the time, worried constantly, zoned out a lot, had poor memory, and could not concentrate. (Tr. 321.) She was also noted as having a "crooked spine" from a car accident. (Tr. 325.) Plaintiff was assessed as having moderate problems with depressive symptoms, anxiety symptoms, and cognitive impairments. (*Id.*) A report two weeks later confirmed bipolar disorder, seizure disorder, and depression, and assigned Plaintiff a GAF score of 40. (Tr. 222.) Plaintiff had also been experiencing backaches and tingling in her legs for four months. (Tr. 242.)

From April through July, 2008, Plaintiff continued to suffer from bipolar disorder, depression, and seizure disorder and was given a GAF score of 44. (Tr. 219.) She stated that her medications were not helping and that she was having problems sleeping. (Tr. 214.) She also reported episodes of panic attacks and paranoia that others were watching or following her. (Tr. 212.) Plaintiff suffered another seizure which resulted in her falling in the bathtub. (Tr. 311.) She later reported

having body aches, decreased energy, and generally feeling exhausted. (Tr. 239.) An August evaluation conducted by board certified neurologist, Guru Motgi, M.D., revealed an abnormal ambulatory electroencephalogram ("EEG"). (Tr. 225.) This was due to temporal sharp waves suggestive of partial or partial complex seizure disorder. (*Id.*)

By September, 2008, Plaintiff reported to Andrew Burke, D.O., P.A., due to knee pain–which she had experienced for the past two years. (Tr. 243.) Dr. Burke also noted that Plaintiff's hair was falling out, which Plaintiff later testified was attributable to her prescription medications. (Tr. 44, 243.)

In October, 2008, Plaintiff again reported to Dr. Burke with knee pain. (Tr. 229.) Impressions of her left knee showed mild distal patellar tendinosis. (Tr. 229.) Impression of her right knee showed small joint effusion and mild lateral patellar subluxation. (Tr. 230.) Plaintiff also reported to Dr. Burke with lower back pain which resulted in abnormal test results. (Tr. 246.)

In November, 2008, Plaintiff underwent a clinical interview and a mental status examination with licensed psychologist Susan Talmage, Ph.D. (Tr. 254-58.) When Plaintiff walked into the room, she was experiencing difficulty breathing, which Dr. Talmage diagnosed as resulting from a panic attack. (Tr. 254.) Plaintiff reported that she isolated herself, could not focus or concentrate, had aches and pains, felt depressed and exhausted much of the time, and had to lie down after being with people. (*Id.*) Further, she felt anxious, nervous, and panicky around new people. (Tr. 254-55.) She also described her mood as sad, nervous, and depressed. (Tr. 256.) Plaintiff also revealed that she had panic attacks daily and felt lonely, aggravated, and irritable. (*Id.*) Dr. Talmage specifically noted that Plaintiff had difficulty concentrating and relied heavily on her mother to help her to keep focused during the interview process. (Tr. 257.) Plaintiff's mother stated that the reason Plaintiff

3

dropped out of school in the seventh grade was because her classmates made fun of her seizure disorder. (*Id.*) Based on the examination and a review of Plaintiff's medical records, Dr. Talmage diagnosed Plaintiff with recurrent major depressive disorder and panic disorder. (Tr. 257.) She also noted that Plaintiff has a history of epilepsy. (*Id.*) Dr. Talmage assigned Plaintiff a GAF of 42 and a prognosis of poor. (*Id.*)

A subsequent medical evaluation conducted by Wendell Jones, M.D., noted the extent of Plaintiff's seizure disorder. (Tr. 266-67.) Specifically, Plaintiff had experienced seizures since she was 11 years old. (Tr. 266.) She had both grand mal and petit mal seizures and had one episode of Status Epilepticus that lasted approximately one hour. (*Id.*) She was noted as having approximately one to two seizures a week. (*Id.*) Plaintiff's seizure disorder had resulted in a decrease in memory. (Tr. 267.)

On November 26, 2008, a mental residual functional capacity ("RFC") assessment was provided by state agency medical consultant Robert White, Ph.D. (Tr. 261-63.) Dr. White opined that Plaintiff was markedly limited in her ability to understand and remember detailed instructions, and in her ability to carry out detailed instructions. (Tr. 261.) He also found Plaintiff moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) work in coordination with or proximity to others without being distracted by them; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) respond appropriately to changes in the work setting; (8) travel in unfamiliar places or use public transportation; and (9) set realistic goals or make plans

4

independently of others. (Tr. 261-62.) On the same day, Dr. White completed a psychiatric review technique. (Tr. 274-87.) Dr. White considered affective disorders, anxiety-related disorders, severe major depressive disorder, and panic attacks, and found that Plaintiff was moderately limited in her restrictions on activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 284.)

Also on November 26, 2008, a physical RFC was completed by James Wright, M.D. (Tr. 288-95.) Dr. Wright found that Plaintiff had no exertional limitations and had the ability to lift 100 pounds or more occasionally and 50 pounds or more frequently. (Tr. 289.) Dr. Wright found that Plaintiff had no postural limitations except being limited to only occasional climbing of ladders, ropes, or scaffolds. (Tr. 290.) Dr. Wright also concluded that Plaintiff had no manipulative, visual, or communicative limitations. (Tr. 291-92.) Dr. Wright lastly concluded that Plaintiff possessed no environmental limitations except that she should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 292.)

By August 2009, Plaintiff continued to suffer from the effects of her mental illnesses, this time reporting daily depression, sudden crying spells, sadness, feeling down, wanting to be in the dark, isolating herself from others, and experiencing anxiety about events she had no control over–e.g., what type of casket she would be buried in and whom she would be buried next to. (Tr. 387.) She also reported suffering from panic attacks daily with shortness of breath, severe fatigue, restlessness, auditory hallucinations, and thinking that people could read her mind. (*Id.*) Also in August, Plaintiff continued to report knee and lower back pain. (Tr. 362.) Medical records stated that she had an extensive history of back and knee pain which was attributable to several car accidents. (*Id.*) She rated the pain as a nine on a pain scale of one to ten. (*Id.*)

5

From September through November, records show that Plaintiff continued to suffer two to three sudden panic attacks a day accompanied by palpitations, tachycardia, tremulousness, a fear of dying, and dyspnea. (Tr. 384.) Further, she continued to behave aggressively and impulsively, had paranoid delusions, and had racing thoughts. (Tr. 378.) Moreover, she also experienced continued knee and lower back pain at an intensity of nine on a pain scale of 1-10. (Tr. 364.)

### **Plaintiff's Testimony at the Hearing**

Plaintiff's impairments were further discussed in the administrative hearing. Specifically, Plaintiff stated that she was forced to quit working because of back pain. (Tr. 75.) She also stated that she was also kept from working because of a loss of concentration, fatigue, anxiety around others, racing thoughts which resulted in panic attacks, and depression that forced her to lock herself in a room and just cry. (Tr. 36-37, 47.) These panic attacks resulted in her having breakdowns at her past job. (Tr. 51.)

Plaintiff testified that she has had altercations at fast food places and at work. (Tr. 48.) She has trouble sleeping, never sleeping through the night. (Tr. 39.) Moreover, her anxiety prevents her from even doing laundry because she can't get it together to separate the colors and is scared she will "mess something up." (Tr. 39.) Plaintiff testified that when she breaks down while she is caring for her child, she turns the child over to her mother and goes to her room to lie down. (Tr. 49.)

Plaintiff testified that she lives with her mother and has never driven. (Tr. 40-41.) Her mother and a friend help her care for her child; her mother does all the shopping, cleaning and cooking. (Tr. 41-42, 46.) Plaintiff does nothing around the house except helping to take care of her child, age one. (Tr. 41.) Plaintiff testified that she was pretesting for taking her GED, but she just lost concentration and stopped going to the classes. (Tr. 43.)

6

### The Vocational Expert's ("VE") Testimony at the Hearing

The VE testified that Plaintiff had no past relevant work. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who is limited to simple work in which interaction with the public and co-workers is incidental and includes hazard precautions, no unprotected heights, no dangerous machinery, no open flames or open bodies of water, and to state whether there would be work in the competitive economy that satisfied those requirements. (Tr. 53.)

The VE answered "yes," and testified that the jobs of laundry worker (light, unskilled with an SVP of 2); cleaner (light, unskilled with an SVP of 2); and mail clerk (light, unskilled with an SVP of 2) exist in significant numbers in the national and local economies. (Tr. 53.) The VE further testified that an individual who missed work more than one day every other week would be unlikely to sustain competitive employment, and that an individual who was "off task" more than six minutes an hour would also be unable to sustain competitive employment. (Tr. 54.)

### The Decision

On April 6, 2010, the ALJ issued a decision finding Plaintiff not disabled within the meaning of the Act. (Tr. 10-27.) In reviewing her claim, the ALJ found, at step one of the sequential evaluation process,[2] that Plaintiff had not engaged in significant gainful activity since March 21, 2008, the date of her SSI application. (Tr. 15 ¶ 1.) At step two, the ALJ found that Plaintiff's seizure

---

[2]The regulations require the Commissioner to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant is performing "significant gainful activity"; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; (5) whether the impairment prevents claimant from doing any other work. 20 C.F.R. § 416.920(a)(4).

disorder, bipolar disorder, and anxiety disorder were severe impairments. (Tr. 15 ¶ 2.) At step three, the ALJ found that Plaintiff's medically determinable impairments did not meet or equal a listed impairment as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15 ¶ 3.) The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible. (Tr. 18.) He determined that Plaintiff retained the RFC to perform a full range of work at all exertional levels, with the following nonexertional limitations: no work around hazards such as unprotected heights, open flames, open bodies of water, or dangerous moving machinery; and that Plaintiff could perform simple work in which the interaction with supervisors, co-workers, and the public is only incidental to the work performed. (Tr. 17 ¶ 4.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 21 ¶ 5.) At step five, The ALJ determined from the VE's testimony that Plaintiff was able to perform a significant number of jobs in the national economy. (Tr. 21 ¶ 9; 52-54.) The ALJ concluded that Plaintiff was not disabled at any time prior to the date of his decision. (Tr. 22 ¶ 10.)

**Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct claimants how the Commissioner will consider the opinions.[3] In the Fifth Circuit, "the opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir. 2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

---

[3] The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

10

**Issues**

1.  Did the ALJ commit reversible legal error when he cited *Stone v. Heckler* but applied a different severity standard?

2.  Is the ALJ's RFC finding supported by substantial evidence?

**Application of Incorrect Legal Standard**

Plaintiff contends that the ALJ failed to apply the severity standard set forth in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985) at Step Two of the sequential evaluation process. (Pl.'s Br. at 8. , citing Tr. 14-15.) Plaintiff further contends that unless the ALJ applied the correct severity standard, the case must be remanded to the Commissioner for reconsideration based upon legal error. *Stone*, 752 F.2d at 1006. After citing the standard set forth in the regulation, the ALJ stated: "The claimant has the following severe impairments: seizure disorder, bipolar disorder, and anxiety disorder (20 CFR 416.920(c)). In this case, under the standard established in *Stone v. Heckler*, 752, F.2d 1099 (5th Cir. 1985), the claimant's impairments caused more than minimal functional limitations, and can be expected to interfere with the ability to work. They are, therefore, severe impairments." (Tr. 15.)

The Commissioner argues that Plaintiff has failed to show what impairments were improperly considered and that Plaintiff "merely asserts that the ALJ used the incorrect standard." (Def.'s Br. at 10.) The Court finds that the standard used by the ALJ created ambiguity. *Craaybeek v. Astrue*, 7:10-CV-054-BK, 2011 WL 539132, 6 (N.D.Tex. Feb. 7, 2011) ("express recitation of a standard inconsistent with the *Stone* standard creates an ambiguity and this ambiguity regarding whether the correct legal standard was used must be resolved at the administrative level"). Plaintiff was obese and had at least some objective evidence to support her complaints of knee and back pain. The Court

cannot determine whether or not the ALJ considered these impairments under the *Stone* standard or the "more than minimal" standard that he applied to Plaintiff's mental impairments.

The ALJ's referral to applicable social security regulations and rulings, including 20 C.F.R. § 416.920(c), 20 C.F.R. § 416.921, SSR 85–28, SSR 96–3p, and SSR 96–4p, earlier in the opinion does not substitute as a proper construction of the *Stone* standard. *See, e.g. Brown v. Astrue*, No. 3–11–CV–0475–BD, 2012 WL 652034 at *3 (Feb. 29, 2012); *Lederman v. Astrue*, No. 3–10–CV–1987–M–BK, 2011 WL 5346268 at *7 (N.D.Tex. Nov. 3, 2011); *Jones v. Astrue,* No. 3–11–CV–0107–BK, 2011 WL 4498872 at *7 (N.D.Tex. Sept.28, 2011); *Garcia v. Astrue,* No. 3–08–CV–1881–BD, 2010 WL 304241 at *3 (N.D.Tex. Jan.26, 2010). The "more than minimal effect on an individual's ability to work" definition that the ALJ used in this case is not the standard set forth in *Stone*. In the Fifth Circuit, the appropriate legal standard for determining whether a claimant's impairment is severe is *de minimus*:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

*Stone,* 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) and citing *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984); *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir. 1984)). *See Loza* v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000). Unlike the standard that the ALJ applied, *Stone* provides no allowance for minimal interference on a claimant's ability to work. Although this court has recognized that the difference between the two statements may appear to be slight, the ALJ's construction is not an express statement of the *Stone* standard nor an acceptable equivalent. The United States District Court for the Northern District of Texas is consistent in its refusal to find that the standard which the ALJ applied in this case is the standard set forth in *Stone*.

*See Sanders v. Astrue*, No. 3:07–CV–1827–G (BH), 2008 WL 4211146 at *7 (N.D. Tex. Sept. 12, 2008); *Scroggins v. Astrue*, 3:08–CV–1444–L (BH), 2009 WL 192875, at *5 (N.D. Tex. Dec. 23, 2008), *rec. accepted*, 598 F. Supp.2d 800, 806-07 (N.D.Tex. Jan. 27, 2009).

The Commissioner contends that even if the ALJ applied an incorrect severity standard, remand is not proper here because the ALJ proceeded beyond step two of the sequential evaluation process. In other words, the Commissioner would treat the error as a procedural error where remand is not required unless a claimant demonstrates prejudice. As the Court correctly points out in *Brown*, at *4, courts in this circuit have no discretion to determine whether such an error is harmless. *See Scroggins,* 598 F.Supp.2d at 806–07. "Unless the correct standard is used, the claim *must* be remanded to the Secretary for reconsideration." *Stone,* 752 F.2d at 1106 (emphasis added); *see also Varela v. Astrue,* No. 4-11- CV- 0232-Y, 2012 WL 473761 at * 5 n. 2 ( N.D.Tex. Jan. 4, 2012), *rec. adopted*, 2012 WL 473918 (N.D.Tex. Feb.14, 2012) (collecting Northern District cases holding that failure to apply the *Stone* standard is legal error requiring reversal); *Adcock v. Astrue,* No. 3-10-CV-2257-BD, 2011 WL 5529555 at *4 (N.D.Tex. Nov.14, 2011) (remand required where the ALJ cited to *Stone,* but nonetheless applied incorrect standard); *Neal v. Comm'r of Soc. Sec. Admin.,* No. 3-09-CV-0522-N, 2009 WL 3856662 at *1 (N.D.Tex. Nov.16, 2009) (ambiguity as to whether proper legal standard was used in making severity determination must be resolved at the administrative level).

Plaintiff's impairments that the ALJ did not find severe were her obesity, her leg pain, her difficulty walking, and her back pain. The difference between the *Stone* standard and that applied by the ALJ, coupled with the ALJ's failure to acknowledge the Fifth Circuit's interpretation of the regulation, constitutes the ALJ's application of an incorrect legal standard and requires reversal and remand for legal, rather than procedural, error. *Sanders*, 2008 WL 4211146, at *7; *Scroggins*, 2009

13

WL 192875, at *5. *See Rangel v. Astrue*, 605 F. Supp. 840, 851 (W.D. Tex. 2009). Reversal is required so that the ALJ can apply the correct standard in determining the severity of all of Plaintiff's impairments under *Stone*.

### The ALJ's RFC Determination, Credibility Determination, and Failure to Consider Examining Physician's Limitations

Plaintiff contends that the ALJ's finding that Plaintiff's testimony is "not entirely credible" is mere boilerplate language that gives no clue to what weight the trier of fact gave the testimony. (Pl's Br. at 12, citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Additionally, Plaintiff contends that the ALJ's discussion "picks and chooses" only evidence that supports his position. (*Id.*, citing *Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir. 2000)). Moreover, Plaintiff contends that all of the evidence cited by the ALJ except the non-examining state agency physician's report supports Plaintiff's allegations of loss of concentration, fatigue, anxiety around others, racing thoughts, panic attacks, and depression, all of which prevent her from working. (*Id.* at 13 citing Tr. 19, 20, 36-37, 39, 47, 51).

The Commissioner responds that the ALJ thoroughly discussed his reasons for finding Plaintiff not credible, i.e., Plaintiff's activities of daily living, noncomplaince with treatment, lack of objective evidence in the record and normal physical consultative exam. (Def.'s Br. at 17.) Additionally, the Commissioner asserts that Plaintiff's treating physicians consistently found that Plaintiff was oriented and exhibited intact concentration, memory, insight, judgment and thought processes. (Def.'s Br. at 19.) Plaintiff notes that the same records also show that Plaintiff suffered from panic attacks, paranoia, depression, anxiety, irritability, blunted affect, and hostility. (Tr. 211, 213, 215, 217, 238, 307, 309, 311, 313, 315, 319.)

The ALJ acknowledged "extensive evidence in the record regarding the claimant's bipolar disorder and panic disorder and the symptoms of these impairments which have included irritability, outbursts of anger, crying spells, panic attacks, anhedonia, insomnia, lack of energy, loss of concentration, and memory loss." Nevertheless, the0 ALJ found that because Plaintiff is able to care for her child at least four days per week, is independent in caring for her personal grooming, and can make simple meals, she is able to obtain and maintain full time employment.

The ALJ fails to acknowledge that Plaintiff's activities of daily living take place in a highly supportive environment. Plaintiff lives with her mother and cares for her child only with the help of her mother and a friend. She has breakdowns and crying spells while she is caring for the child, during which she has to leave the child with others and isolate herself in her room. Additionally, Plaintiff performs no housework, does not drive, and has never driven. She made attempts to work seasonally, but was fired or quit. She has no past relevant employment. The ALJ accepted the VE's testimony that Plaintiff could perform the job of laundry worker, yet failed to reconcile that with Plaintiff's testimony that she cannot even do her own laundry because (1) she has trouble "getting it all together," (2) becomes confused sorting the colors and trying to do it the correct way, and (3) fears that she will "mess something up."

A GAF score reflects an examining clinician's determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32. The ALJ acknowledged that a GAF score of 40 to 46 indicates severe symptoms and major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id*. The ALJ also noted that Plaintiff's GAF was evaluated at 40 to 46 in 2008

and 45 in August 2009. Dr. Talmage, an examining consultative clinician assessed Plaintiff's GAF at 42 and her prognosis as poor. The ALJ mentioned Plaintiff's examination by Dr. Talmage, the examining mental health physician who found Plaintiff's symptoms to be severe. However, the ALJ assigned it no weight and did not discuss the limitations recognized by Dr. Talmage. Nevertheless, the ALJ made his own determination of Plaintiff's overall level of functioning as "capable of performing simple work" based upon a finding that Plaintiff's testimony is "not entirely credible" and the conclusions of non-examining state agency psychological consultants. As a matter of law, when a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician, reports of the non-examining physicians do not provide substantial evidence. *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980). Although the ALJ must determine a claimant's RFC, this determination must be supported by substantial evidence. Because the non-examining state agency consultants' conclusions contradict and are unsupported by findings made by an examining physician, the ALJ erred by relying upon them. Therefore, substantial evidence does not support the ALJ's RFC determination.

In addition to the legal error at Step Two which requires reversal and remand, the lack of substantial evidence to support the ALJ's credibility and RFC determinations also requires reversal and remand.

## **Recommendation**

The Commissioner's decision should be reversed and remanded for further consideration

beginning at step two of the sequential analysis.

      SO RECOMMENDED, May 22, 2012.

                                      _____
                                      PAUL D. STICKNEY
                                      UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).